IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BRUCE B., | ) |
|       Plaintiff, | ) ) ) |
| v. | ) No. 19 C 2639 ) |
| ANDREW M. SAUL,<br>Commissioner of Social Security, | ) Magistrate Judge Finnegan ) ) |
|       Defendant. | ) ) |

## ORDER

Plaintiff Bruce B. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"). (Doc. 1). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the case was reassigned to this Court. (Docs. 5, 7). Plaintiff filed a motion for summary judgment arguing that the Commissioner's decision should be reversed or the case remanded, and the Commissioner filed a cross motion for summary judgment. (Docs. 15, 16, 23, 24). After careful review of the record and the parties' respective arguments, the Court concludes that the case must be remanded for further proceedings as outlined below. The Court therefore denies the Commissioner's motion and grants Plaintiff's request for remand.

## BACKGROUND

Plaintiff applied for DIB on August 9, 2013, alleging disability since October 30, 2012 due to cervical spine disorders, left arm atrophy, left knee needing total replacement following "ACL" (anterior cruciate ligament) repairs, "GERD" (gastroesophageal reflux

disease), right knee problems, chronic depression, chronic pain, and high cholesterol. (R. 80, 87, 265-74, 303, 306). Born in 1963, Plaintiff was 49 years old at the time of the alleged onset date (R. 24, 79-80, 87, 265, 303), making him a younger person (under age 50). 20 C.F.R. § 404.1563(c). Plaintiff subsequently changed age category (R. 24) to that of a person closely approaching advanced age (age 50-54). 20 C.F.R. § 404.1563(d). His date last insured was December 31, 2017. (R. 79, 87, 303). Plaintiff completed three years of college. (R. 307). He worked as a nurse from 1991 or 1992 until November 2012 (shortly after the alleged onset date) and again briefly in 2015 or 2016. (R. 48-52, 307, 382-85).

The Social Security Administration denied Plaintiff's applications initially on April 2, 2014 and on reconsideration on July 31, 2015. (R. 117, 139, 142-46, 149-52). Plaintiff then requested a hearing, which was later held before Administrative Law Judge ("ALJ") Kathleen Kadlec on October 25, 2017, where Plaintiff was represented by counsel. (R. 40-78, 156-57). Both Plaintiff and Vocational Expert ("VE") Kathleen Doehla testified at the hearing. (R. 47-76, 395-96).

The ALJ denied Plaintiff's claims in a decision dated April 17, 2018. (R. 13-25). The ALJ found that Plaintiff's degenerative disc disease of the cervical spine and osteoarthritis of the knees, worse on the left, are severe impairments, but they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 16-18). The ALJ concluded that Plaintiff retains the residual functional capacity ("RFC") to perform sedentary work with the following restrictions: occasionally operate foot controls with the left foot; frequently operate hand controls with the left hand; occasionally reach overhead with the left upper extremity; frequently reach in all other

directions with the left upper extremity; frequently handle, finger, and feel with the left hand; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, and crouch; never kneel or crawl; never work at unprotected heights; occasionally work around moving mechanical parts and in environments with vibration; and occasionally operate a motor vehicle. (R. 18).[1]

The ALJ accepted the VE's testimony that a person with Plaintiff's background and RFC had acquired transferable skills from his past relevant work as a nurse and could perform jobs that existed in significant numbers in the national economy, namely Nurse Consultant. (R. 24-25, 68-69, 71-74). As a result, the ALJ found that Plaintiff was not disabled from his October 30, 2012 alleged onset date through the date of the decision. (R. 14, 25). The Appeals Council denied Plaintiff's request for review on February 15, 2019 (R. 1-6), rendering the ALJ's April 2018 decision the final decision of the Commissioner reviewable by this Court. *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

In support of his request for reversal or remand, Plaintiff argues that the ALJ erred in: (1) determining the RFC based on Plaintiff's physical impairments; (2) evaluating the October 12, 2015 opinion of his treating primary care physician, Greg Ozark, M.D, regarding physical limitations; (3) including no mental restrictions in the RFC to

---

[1] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools . . . Jobs are sedentary if walking and standing are required occasionally . . . ." 20 C.F.R. § 404.1567(a). "[P]eriods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5; *see also Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995) ("A claimant can do sedentary work if he can (1) sit up for approximately six hours of an eight-hour workday, (2) do occasional lifting of objects up to ten pounds, and (3) occasionally walk or stand for no more than about two hours of an eight-hour workday.").

accommodate a mild limitation of concentration, persistence, or pace; and (4) assessing the subjective symptom allegations. For reasons discussed below, the Court finds that the case must be remanded for further consideration of the RFC determination.

## **DISCUSSION**

I.     **Governing Standards**

    A.     **Standard of Review**

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the SSA. In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the applicable regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and

4

quotation marks omitted)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

### B. Five-Step Inquiry

To recover disability benefits under the SSA, a claimant must establish that he is disabled within the meaning of the SSA. *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016). A claimant is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520). If the claimant meets his burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

II.     Analysis

    A.     RFC

Plaintiff argues that the case must be reversed or remanded because the ALJ erred in determining that he retains "the RFC to perform sedentary work with occasional posturals" based on his neck, left arm, and left knee impairments. (Doc. 16, at 4-8). A claimant's RFC is the maximum work that he can perform despite any limitations. *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *2. "Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012). Plaintiff challenges the RFC finding as to standing and walking for two hours, and sitting for six hours, in an eight-hour work day; lifting and carrying up to ten pounds; and "performing all postural activities." (Doc. 16, at 5-7). The Court finds that the ALJ did not explain the basis for concluding that Plaintiff is able to stand, walk, and sit as required to perform sedentary work.

On October 30, 2012 (the alleged onset date), Plaintiff sustained a work-related injury resulting in neck and left arm pain, for which he treated with pain management specialist Yasser Hussein, M.D. and neurosurgeon Juan Jimenez, M.D. (R. 401-05, 457-59, 484-86, 1432-33, 1442). A November 2, 2012 MRI of the cervical spine showed various abnormalities. (R. 470-71, 486). In early November 2012, Dr. Hussein administered two cervical epidural steroid injections ("ESIs"). (R. 513-24, 1380-81, 1443). On examination in mid November 2012, Dr. Jimenez noted intact gait and muscle strength of 5/5 of the major groups in the upper extremities, but 3/5 strength of the left deltoid,

cervical paraspinal tenderness, and diminished range of motion of the cervical spine. (R. 484-86).

On December 4, 2012, Plaintiff underwent an anterior cervical discectomy with decompression and fusion. (R. 474-75, 531-33, 768-69, 773-75). In 2012 and 2013, Plaintiff continued to treat regularly with Drs. Hussein and Jimenez and occasionally saw internist Dr. Ozark. He reported doing well in late December 2012, but complained of neck and arm pain as well as limited range of motion of the neck from January to July 2013. (R. 490-99, 534-36, 561-67, 655, 660, 684-89, 1426-31, 1434-41). Plaintiff received cervical ESIs, and he attended physical therapy but stopped in March 2013 due to "family issues." (R. 487-89, 500-12, 589-90, 592-93, 595-96). A May 2, 2013 cervical MRI showed postoperative changes and other abnormal findings. (R. 688). An examination in July 2013 revealed intact gait and muscle strength of 5/5 of the major groups in the upper extremities, but 4/5 strength of the left deltoid and bicep, cervical paraspinal tenderness, forward flexed posture, and diminished range of motion of the cervical spine. (R. 684-86).

On October 4, 2013, Plaintiff underwent another anterior cervical discectomy with decompression and fusion. (R. 710-14, 716-38, 759-64). From mid October to December 2013, Plaintiff generally reported improved neck and arm pain as well as improved range of motion, though he complained of some radiculopathy and increased pain with activity. (R. 808-10, 813-15, 1419-25). An examination in mid November 2013 noted "definite improvements" following surgery; intact gait; muscle strength of 5/5 of the major groups in the upper extremities but 4/5 of the left deltoid, bicep, and triceps; cervical paraspinal tenderness; and diminished range of motion of the cervical spine. (R. 813-15). On

consultative examination in late November 2013, internist Dinesh Jain, M.D. observed that Plaintiff had reduced range of motion of the neck, marked limitation in range of motion of the cervical spine, significant atrophy of the left deltoid, partial atrophy of the left bicep, intact range of motion of the upper extremities except for the left arm, about 4/5 muscle strength of the left arm compared to 5/5 in the right arm, normal finger dexterity and grip strength, and normal fine finger manipulation. (R. 820-23).

From 2014 to mid 2017, Plaintiff continued to see Dr. Hussein regularly for management of neck and arm pain and occasionally saw Dr. Ozark. From January to March 2014, Plaintiff complained of neck and arm pain as well as intermittent tingling and numbness radiating down the arm and hand. (R. 1411-18). In April 2014, his arm pain had 100% resolved, and his neck pain had partially resolved, after a cervical ESI. (R. 1407-10). On examinations from April to June 2014, Plaintiff had mild atrophy of the left shoulder, limited range of motion of the neck, normal or mildly limited range of motion of the left arm, mild atrophy of the left shoulder, and normal power in the hands. (R. 870-80, 1407-10).

The pain in his neck and left arm worsened from November 2014 to February 2015, but improved 60-70% in April 2015 following a cervical ESI. (R. 1395-1406). From May to August 2015, Plaintiff's arm pain had completely resolved, though he still had neck pain and limited range of motion of the neck but normal power in the arms. (R. 1390-94). In July 2015, consultative examiner Dr. Jain noted normal range of motion of all joints of the upper extremities, normal fine finger manipulation, and decreased range of motion of cervical spine. (R. 1059-61).

In December 2015 and January 2016, Plaintiff complained to Dr. Hussein of neck pain, left arm pain, and left arm numbness. (R. 1388-89). But in February 2016, he reported doing well on medications and getting reasonable relief. (R. 1387). In March 2016, he said his pain had improved 70-80% after a cervical ESI. (R. 1386). And in May, July, and October 2016, Plaintiff was still doing well, and his pain responded to medications. (R. 1383-85). In January 2017, Plaintiff reiterated that his neck pain had improved since the cervical ESI in March 2016, and he had not used pain medications for more than three months. (R. 1382).

By May 2017, Plaintiff had not taken pain medications for five or six months because his pain had been under better control, but he complained of worsened pain in his neck and left arm, heaviness in his arm, and numbness in his fingers. (R. 1610). An examination showed mildly decreased power in the upper extremities, mildly reduced left hand grip of 4/5, decreased pinprick sensation on the left forearm, and decreased triceps deep tendon reflexes of 2/4. (*Id.*). Based on Plaintiff's past good response to cervical ESIs, resulting in relief for eight or nine months each time, he received another injection in June 2017. (R. 1610, 1621). The record contains no further notes of neck and arm treatment.

In addition to Plaintiff's neck and arm problems, he also received treatment for left knee pain. In November 2013, consultative examiner Dr. Jain wrote that Plaintiff had profound degenerative joint disease of both knees, his flexion and extension of the knees was limited with crepitation, and he could not squat or hop on one leg due to knee pain. (R. 822). Still, Plaintiff's gait was normal; he walked without an assistive device; and he had no difficulty getting on and off the exam table, tandem walking, and walking on toes

and heels. (*Id.*). In mid December 2013, x-rays of the left knee showed evidence of ACL reconstruction with interference of screws and mildly severe degenerative changes. (R. 826, 830). Plaintiff received Orthovisc injections in the left knee from late December 2013 to January 2014 and again from September to October 2014. (R. 827-29, 1052-57). Though normal in June 2014, his gait was abnormal in September 2014. (R. 866-69, 1055-57).

From September 2014 to March 2016, Plaintiff regularly treated with orthopedic surgeon Marc Asselmeier, M.D. for left knee problems. He also saw Dr. Hussein in connection with left knee pain from May 2015 to May 2017. On January 6, 2015, Plaintiff underwent left total knee replacement surgery. (R. 894-985, 992-1047). In April 2015, he was doing well after surgery with minimal pain, but in May 2015 he experienced increased pain and swelling in the left knee after working on cars, running wiring, and moving a plywood board. (R. 988-89, 1098-1101). In early July 2015, consultative examiner Dr. Jain noted that Plaintiff walked with a cane due to degenerative joint disease of the left knee; his extension and flexion of the left knee was limited; and he could not hop on the left leg or walk on toes and heels due to knee pain, but had no difficulty getting on and off the exam table, squatting, and rising. (R. 1060-61). August 2015 x-rays of the left knee showed some lysis underneath the tibial component, potentially consistent with loosening. (R. 1080-84, 1234-42). Through the fall of 2015, Plaintiff continued to complain of left knee pain, stiffness, and swelling, and his gait was abnormal. (R. 1071-97, 1392-94).

On October 20, 2015, Plaintiff had revision surgery of the left tibial compartment of the left total knee arthroplasty. (R. 1141-1219). On December 29, 2015, he underwent

left knee arthroscopy with debridement and manipulation. (R. 1123-32). In early 2016, Plaintiff complained of left knee pain and swelling. (R. 1113-17, 1388). X-rays showed some subtle lucency around the tibial component. (R. 1108-13, 1220-23). Plaintiff obtained a second opinion from orthopedic surgeon Craig Della Valle, M.D., who diagnosed an infection and, on May 23, 2016, performed surgery to remove all prosthetic knee components and placed an antibiotic spacer. (R. 1457-1519). On July 25, 2016, Plaintiff had revision left total knee arthroplasty with removal of the antibiotic spacer. (R. 1548-95).

In October 2016, Plaintiff reported significantly decreased left knee pain following surgery, but in January 2017 he complained of left knee pain. (R. 1382-83). On examination in May 2017, he displayed left antalgic gait with mildly flexed left knee due to surgical adhesions, and the left knee was about 15 degrees short of full extension though not swollen or tender. (R. 1610). The record contains an August 2017 prescription for a cane but no further treatment notes regarding Plaintiff's left knee. (R. 1624).

The ALJ summarized much of the foregoing medical evidence of neck, left arm, and left knee impairments. (R. 19-20). And, in crafting the RFC determination, the ALJ accorded partial weight to the July 29, 2015 opinion of state agency reviewing physician Sumanta Mitra, M.D. on reconsideration, finding that Plaintiff: could stand or walk for two hours, and sit for about six hours; occasionally lift and carry 20 pounds, and frequently lift and carry ten pounds; was limited in the left upper extremity in terms of pushing and pulling (including operation of hand or foot controls); could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; could frequently stoop; could occasionally crawl; was unlimited in terms of balancing, kneeling, and crouching; could occasionally reach in any

11

direction with the left arm; and was unlimited in terms of handling, fingering, and feeling. (R. 21, 131-33). The ALJ then concluded that Plaintiff retains the RFC to perform sedentary work with (in relevant part) postural limitations as follows: occasionally climbing ramps or stairs; never climbing ladders, ropes, or scaffolds; occasionally balancing, stooping, and crouching; and never kneeling or crawling. (R. 18). It is unclear, however, why the ALJ adopted Dr. Mitra's assessment of the standing, walking, and sitting abilities necessary to perform sedentary work.

The ALJ found that, "[d]ue to degenerative joint disease primarily in the left knee," Plaintiff was "limited to primarily seated work with no more than occasional postural movement." (R. 23-24.) But the ALJ did not address how the evidence of Plaintiff's left knee problems demonstrated that he was able to stand or walk for two hours, and sit for about six hours, as Dr. Mitra opined. This omission is significant because, in the July 29, 2015 opinion, Dr. Mitra did not address the full extent of Plaintiff's left knee impairment, which continued through 2017 and required repeated surgeries from 2015 to 2016.

First, Dr. Mitra considered only limited treatment records from October 2012 to mid December 2013 but not other important records from late December 2013 to early July 2015. For example, Dr. Mitra noted: Plaintiff's normal or intact gait on examinations in November 2012, July 2013, and November 2013; his limited range of motion of both knees in November 2013; and mid December 2013 x-rays of the left knee showing evidence of ACL reconstruction with screws in the femur and tibia and mildly severe "DJD" (degenerative joint disease). (R. 133, 484-86, 671-79, 684-86, 822, 826, 830). Dr. Mitra relied in part on Plaintiff's mildly severe degenerative joint disease of the left knee as the basis for the exertional limitations, including standing or walking for two hours and sitting

12

for about six hours. (R. 131). But Dr. Mitra made no mention of other records documenting ongoing treatment and more functional limitation, namely: the Orthovisc injections Plaintiff received in his left knee from late December 2013 to January 2014 and again from September to October 2014; his abnormal gait in September 2014; the January 2015 left total knee replacement surgery; and Plaintiff's use of a cane, inability to hop on the left leg or walk on toes and heels due to knee pain, and limited range of motion of the left knee in early July 2015. (R. 827-29, 894-985, 992-1047, 1052-57, 1060-61). The ALJ likewise ignored the left knee injections in 2013 and 2014 and Plaintiff's abnormal gait in 2014. While the ALJ acknowledged the January 2015 surgery as well as Plaintiff's use of a cane and negative findings on examination in early July 2015 (R. 19-20), she did not say why this evidence did not warrant a greater degree of limitation than Dr. Mitra found with regard to standing, walking, and sitting.

Second, Dr. Mitra did not have access to significant evidence from 2015 to 2017 documenting Plaintiff's worsening left knee problems. Over the course of more than a year and a half from January 2015 to July 2016, Plaintiff underwent five left knee procedures as follows: (1) left total knee replacement surgery in January 2015; (2) revision surgery of the left tibial compartment of the left total knee arthroplasty in October 2015; (3) left knee arthroscopy with debridement and manipulation in December 2015; (4) removal of all prosthetic knee components and placement of an antibiotic spacer in May 2016; and (5) revision left total knee arthroplasty with removal of the antibiotic spacer in July 2016. (R. 894-985, 992-1047, 1123-32, 1141-1219, 1457-1519, 1548-95). Dr. Mitra said nothing about the January 2015 surgery, as noted above, and the other four surgeries took place after the denial on reconsideration (on July 31, 2015) of Plaintiff's

13

DIB application. The ALJ considered the January 2015 left total knee replacement surgery, the October 2015 revision surgery, the May 2016 removal of prosthetic components and placement of antibiotic spacer, and the July 2016 revision surgery though not the December 2015 arthroscopy. (R. 19-20). But the ALJ offered no explanation for why she determined that Plaintiff's repeated left knee surgeries supported no more restrictions in terms of standing, walking, and sitting than Dr. Mitra opined in July 2015.

In addition to the surgeries, further evidence of Plaintiff's ongoing left knee impairment also included: complaints of left knee pain, stiffness, and swelling, as well as abnormal gait, leading up to the surgeries in late 2015; complaints of left knee pain and swelling prior to the surgeries in mid 2016; and complaints of left knee pain, as well as left antalgic gait with mildly flexed left knee about 15 degrees short of full extension, in the first half of 2017. (R. 1071-97, 1113-17, 1382-83, 1388, 1392-94, 1610). The ALJ did not address Plaintiff's abnormal gait in 2015 or his complaints of left knee pain in 2016 and 2017. (R. 19-20). While the ALJ noted that in 2017 Plaintiff showed an antalgic gait and mildly flexed left knee, she failed to explain why she concluded that these findings did not demonstrate additional limitations as far as standing, walking, and sitting than Dr. Mitra assessed in July 2015. Under the circumstances of this case, the ALJ cannot rely on such an outdated reviewing physician opinion without explaining her basis for doing so. *See Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) (ALJ relied on outdated reviewing consultants' opinions rendered before pain specialist treated plaintiff, treating physician performed surgery and opined that plaintiff had increased pain and diminished functioning, and physical therapist found plaintiff's functional abilities diminished); *Stage*

*v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (" . . . ALJ erred by continuing to rely on an outdated assessment by a non-examining physician . . . ").

Third, the ALJ expressly acknowledged that additional evidence available "at the hearing level establishe[d] significant limitations to standing and walking due to [Plaintiff's] repeated left knee issues requiring surgical intervention." (R. 21). For this reason, the ALJ gave little weight to the February 14, 2014 opinion of state agency reviewing physician George Andrews, M.D. on initial review that Plaintiff could stand or walk for about six hours per day. (R. 21, 91-93). While much of the same evidence also was unavailable to Dr. Mitra on reconsideration in July 2015, the ALJ never articulated why she found that further evidence at the hearing level somehow remained consistent with Dr. Mitra's opinion regarding standing, walking, and sitting.

Finally, the ALJ imposed more restrictions on postural activities than Dr. Mitra opined, emphasizing that "the evidence of deltoid atrophy and ongoing neck pain support limitations to sedentary exertion with additional reaching and postural limitations." (R. 21). At the same time, the ALJ stated that Plaintiff's "degenerative joint disease primarily in the left knee" also warranted "primarily seated work activity with no more than occasional postural movement." (R. 23-24). As such, the ALJ apparently concluded that Plaintiff's left knee problems contributed to a further decline only in postural functioning— yet somehow not any worsened ability to stand, walk, or sit—than Dr. Mitra assessed. But the ALJ never said why she found this to be the case.

The ALJ must build a logical bridge from the evidence to the RFC determination that Plaintiff is able to stand or walk for no more than two hours, and sit for six hours, in an eight-hour work day. *See Simila*, 573 F.3d at 513. On this record, the Court cannot

15

discern the ALJ's reasoning for reaching this conclusion. For all of the foregoing reasons, this case is remanded for further proceedings consistent with this opinion to reconsider the RFC determination.

### B. Remaining Arguments

The Court does not find any specific error with respect to Plaintiff's remaining arguments, but on remand the ALJ should evaluate the treating physician's opinion, address Plaintiff's mental impairments, and assess the subjective symptom allegations.

### CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment (Doc. 15) is granted, and the Commissioner's motion for summary judgment (Doc. 23) is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: April 5, 2021

SHEILA FINNEGAN
United States Magistrate Judge